May it please the Court, I am Deanna Lamb, appearing on behalf of my client, Grateful Tran, and we realized this morning that the docket did have his name reversed, and my client's first name is Grateful. It's not, it wasn't our, the clerk that's here. It's the docket. The clerk's office a long time ago got it wrong, so it wasn't Gwen's fault. No, no. We checked this morning and found that the clerk's docket should have a comma after Tran, or it should be just reversed, that it's Grateful Tran. And he's grateful that the Court is hearing his case, especially on this auspicious day for the nation. There are four issues in this case. There are two primarily that I would like to address with the Court. Initially, the limitation on the defense. Mr. Tran is doing 25 years to life in prison for first-degree murder, which he asserted should have been a conviction for voluntary manslaughter. And in the prosecution's final argument at trial, he says that reasonable people, we've all been taught that sticks and stones may break our bones, but words will never harm us. And he was talking about the fact that what had happened to my client and his friend wasn't a painful injury, and that the only word that had been used in the altercation itself was that my client's friend had been called a bitch. Now, what was not introduced in the trial was that immediately after this altercation, while Mr. Sosa is walking away laughing and with his hand in pain, says, I just fucked up two nips. And the defense is precluded by the prosecution's in limine motion from using the racially derogatory term. And Respondent argues that there's no clear evidence that in this loud verbal altercation that was heard by several people. That's why there's no clear evidence. There's no evidence. There's no evidence other than the inference that you suggest could be drawn from what was said later. That's right. There were witnesses who were some distance away who heard loud yelling. How many of them heard the bitch statement? Several of them. That was Mr. Sosa's friend heard that. There was another witness who called 911. She was too far away to hear, but she told the police that what was going on was vicious. And she was too far. I thought there were other people other than the friend who reported that word. Well, we can check that, but go ahead. It's only relevant to whether they could have ‑‑ if they did hear what was said, why wouldn't they have heard something else if it was also said? Well, it's also yelling that's going on inside a car. Mr. Sosa is reaching into my client's car in his driveway to beat up these two people. And so the people who are on the street, even though they're witnessing this, and this is humiliating that this is happening in public, it's in a situation where not all of the conversation is that easy to understand. But certainly the defense attorney argued in two different ways to the court that this racial epithet is something that shows the sentiment and the energy with which Mr. Sosa does this beating, that this is not a gym class. Is that the reason you wanted it, to show that he had energy? That was part of his argument to the trial court, that this shows the level of animosity that Mr. Sosa was directing at Mr. Tran and Mr. Nguyen. And also there's the inference that if he used it immediately afterwards, that he used it along with the other terms that he was using during the altercation. But ultimately, but this, after all our discussion about structural errors, this is not a structural error. This is an evidentiary question, right? This is the defendant's ability to present his defense. But you would have to demonstrate that there was some real likelihood at least, or whatever standard we're applying, correct or whatever, that the jury which didn't find heat of passion from having, from what did happen, which was these people were punched in the face for absolutely no reason, hurt, and called at least some nasty names, would have come to that conclusion if they had thought that racist names were used. That's basically your burden. Yes. And I guess I'd like to know from whence we would come to that conclusion, given the stress that the prosecutor made, for example, on the fact that there was some time that ensued, they had to go back to the house, they had to get the guns, you know, it was not all one continuous event. But it was events that happened within minutes. Right. And so that there was this provocation, and part of the defense is that there hasn't been time to cool off, that when you're in this, my client is at that point barely 16. He's the height that I am without the high heels and 40 pounds lighter than me, and has just been accosted in his driveway, in his car. Well, that's the point. The whole thing was terrible and distressing as it was. So the question is why the jury would have come to a different conclusion if it made the inference. First of all, it would have to make the inference you're asking it to make. So that's sort of a discountable, but it's possible, but, you know, fairly remote. And then if it made that inference, it would have to, that would have to be the swing between heat of passion and not heat of passion. And this was a very close, I mean, it's not a far swing. When you have the other question in terms of juror misconduct, you have a situation where the jury deliberated for a long time, and this is a close question as to whether this was at a level that a reasonable person would respond in this way. And the argument that defense counsel was able to argue that it was a racially motivated offense because in final argument, he's only able to use the sanitized version of the testimony and not the full extent of the testimony. If the statement is admissible at all, it should be completely admissible. But what he gets to introduce is without this key phrase and the fact that he's able to talk about verbal abuse and these other terms doesn't mean that the jury got to understand the full impact of what was happening that day. And so it's fundamentally unfair in terms of what he was trying to present as his defense. And whether it's under the application of Tinsley v. Borg or if you look at the general due process standard that he was limited in, his ability to present his defense, that issue should lead to reversal. And when we talk about that short swing that had to take place in terms of the jury's understanding of the events and whether or not there was provocation and whether there was an emotional... It was certainly provocation. Obviously there was provocation. And there was obviously an extremely distressing... I mean, the problem here is that what they knew happened was sufficiently distressing that if they weren't willing to see that given the ensuing events as heat of passion, my problem is why this distinction would have made a difference. There was obviously provocation. They were obviously angry. There was obviously reason for them to be angry without this information. So I need help with seeing how this could have made a difference or enough of a difference for us to merit reversing the conviction. Well, it's the same as the difference between an assault and a hate crime. There is a difference. And it's a difference that both the Federal law and the State law recognizes, that when you have something that's racially motivated, that it's a different level of offense and it's punished differently. And that's what Mr. Sosa was committing. Right. Thank you. I think we get the argument. Thank you. Well, then with regard to the jury misconduct, my client was not given his day in court, in State court, with regard to the motion for new trial. He presented the affidavit of a juror that outlined very true to State and Federal cases, misconduct in terms of the legal opinion that was given to the jury that the drive-by shooting, the circumstance of shooting from the automobile and this being the felony murder of a drive-by shooting, trumps any provocation. And certainly there were counter declarations from some jurors. There was, aside from Mr. O'Sullivan, the foreman who gave the most favorable declaration, there was another juror who said that the juror, Jack Wu, who made the statement, did make that statement in argument, that it wasn't that he factually didn't believe that there was provocation, but that provocation does not apply to a drive-by shooting. And so given the evidence that was presented, there should have been a day in court for my client where that could have been fleshed out at a hearing and ---- And aside from all the declarations, I think every one of which is inconsistent with O'Sullivan's, isn't the jury ask this question and get a very complete explanation in the middle of the deliberations? And we don't know the timing of whether that, the court's answer, when the jury, the jury was fully instructed on all of these elements, and then they came back and, can there be any consideration if this is a drive-by shooting? And they got a very specific answer twice. And they got an answer. But we don't know whether that, in terms of the timing, came before or after the situation where Juror Wu says that legally it does not apply. And the jury looked to him as a lawyer because during the initial stages of deliberation, someone thought he should be the foreman because he was a lawyer. So even though the statement attributed to him that I am a lawyer and this is my opinion was never, never given and no one has really quoted that. That was kind of a straw man that the district attorney put forward that that was the statement and so, therefore, no one heard that particular statement. But what they did hear was an opinion from someone who they recognized was a lawyer about the legal impact. And it was contrary to what the court had instructed both initially and in response to the jury's question. If the court has no further questions, I'd like to reserve time for rebuttal. Thank you. May it please the Court, Ryan McHale for Respondent. Addressing the question of, the evidentiary question regarding the epithet. As pointed out in our briefs, the factors that this Court has set forth in Tinsley v. Borg are not technically the controlling Supreme Court authority under ADEPA, but are nonetheless a helpful analysis. The district court here found that two of the factors strongly favored the exclusion of this statement. Our position is that that is not only correct, but that actually all five factors support the exclusion of this evidence. The statement was not probative as to the central issue in this case. Specifically, whether or not the defendant acted out of a heat of passion. Put this in context. We're talking about a balancing test where you're weighing factors. The district or the trial judge weighed the factors and found it more prejudicial and probative? That's correct. And we would have to say that that's an unrealistic and unreasonable, objectively unreasonable ruling. Not just that it was wrong, but it was objectively unreasonable for him to come to that result after balancing the factors. Well, that is the applicable question. And in this case, weighing the probative against the obvious potential for prejudice, the court was well within its discretion. So what I'm saying is we would have to say not only that he made an error, that he abused his discretion, but it would be an unreasonable conclusion that he not only erred, not only clearly erred, but did more than that. It was objectively unreasonable. Well, yes. Yes. That is the standard. And as we've pointed out in our briefs, Petitioner hasn't come close to establishing it. And then in addition, we'd have to deal with Judge Berzin's second problem of whether that was sufficient, had a sufficient prejudicial effect. That's correct. And I think that the issue has been pretty fairly addressed in the briefs. The only thing I could add is even if there was, even if the jury could possibly draw the inference that because the victim made this statement later, he must necessarily have made it before, a tenuous. Not that necessarily, but that he. But he might have. There was some inference. And if a word for the fact that this plainly does have a, could have a prejudicial impact, I suppose, on the government's case, you know, maybe you would let it in. But such an inference is possible. It's a little far-fetched, but it's possible. Right. But that would be the inference that the victim actually made the statement, whereas the defense was, has nothing to do with, well, not nothing, but the actual defense is that the defendant here heard it. And that's a completely, it's a related question, but it's not the same. So just because. What's the difference? I don't understand. The inference they want you to draw is that the victim said to the defendant or defendant's friend, made racial epithets to the, that caused his passion. Right. If he made it, why wouldn't we assume he heard it? Well. I mean, it's a reasonable inference that he made it. It's a reasonable inference that the defendant heard it. Well, I believe Petitioner's already argued today that in this, that in the heat of the fight, bystanders couldn't hear certain statements. They were in the car together. Yes. Their argument was that it happened in the car so that the bystanders couldn't hear it. Right. I mean, that's not one of your stronger arguments, that he couldn't have, wouldn't have heard it. It's not. Okay. It's merely an additional argument. I'm sorry. Frankly, it seems to me that this statement could be informative in a more subtle way as to what was actually going on here. I mean, these are kids who are, you know, living near each other. There's probably, or at least the statement suggests that there's racial animosity or division between them, and that whether the remark was, any remarks were actually made or not, the statement would suggest that the victims of the beating would have read in some racial, or could have read in some racial message in the beating. I mean, it's very hard to understand what this beating was about. Somebody's walking down the street and says to somebody else, what's up? And the guy walks over and starts, you know, punching him in the face quite vigorously, apparently, and calling him names. It does suggest there's something going on that nobody's understanding. And to that degree, without having to draw an inference that there were actual statements made, you can at least draw an inference that there's racial tension in this community and that that's really what the victims understood, the victims of the beating understood the fight to be about. Well, I don't think that simply using the statement would necessarily, I'm sorry, not necessarily, would tend to prove that there was a racial animus and that the victim was, in fact, motivated by that, as opposed to some other possible explanations, such as gang involvement. But what do you, Judge Breslin raised a question with your opponent of what it would add to the heat of passion if the defendant had heard racial remarks made? Could that have influenced the decision that he was acting in the heat of passion? Do you disagree that if, in addition to being, having this inexplicable assault, or in addition, if you'd said to him, you know, this is what Japs deserve or Nips deserve, this is what you get in our neighborhood, that that might not have had caused so much more passion in the victim, that maybe a jury would have taken that into account? Our position is that it would have such a slight marginal probative value. If at all, that it's... Take it as, suppose they'd been black and the people who beat them had said, they're niggers, that's what you deserve. Would not the use of that word maybe have contributed to the heat of passion? To a marginal degree, yes. And the problem, though, is that the beating itself and the other terms that were used to describe it was the heat of passion, that to inject a racial element to it, it would add a slight value. The problem with this case, however, is that there was no evidence that the defendants actually heard such a statement. No, that's a separate question. No, the question of whether it's a reasonable inference to draw that they actually said something like that is a separate question from the question I was asking you, if you assume that some kind of racial epithet were added to the mix, whether that might not, in fact, just be enough to cause the jury to say, yeah, it really was in the heat of passion. Not only did he get beaten, but he was humiliated. He wasn't just called a bitch, which they call each other all the time. It's almost a term of endearment. But there was a racial attack, which really does arouse the deepest reactions in people, deepest emotions. In that regard, I would agree that there is, that if the defendant would have heard the racial remark and would have acted immediately upon it, as opposed to running into the house, getting the firearms, and then searching out the victims later on, that that might be a different case. But he didn't act immediately on it. Excuse me? But he did not act immediately on it. Not in this case. Following the beating, they ran into the house, presumably to retrieve the firearms, and then drove and basically hunted down the two victims, which would make any sort of, which would sort of negate the idea that they were acting on heat of passion at all, but certainly not one that was reasonable. And that was the prosecutor's argument. The prosecutor's argument wasn't that they weren't very upset by the beating and terribly and entirely angry and so on. It was that there was just enough stuff that intervened, enough time and deliberation in between. That's right. It was a multi-faceted argument, but that certainly was one of them. Unless Your Honors have any further questions on this, I'll address the juror misconduct claim. Petitioner began by saying that the error here, or at least part of the error, was that he didn't have his day in court to develop the factual record. That's simply not the case. In this regard, I direct Your Honors' attention to the reporter's transcript of March 26th at pages 10 and 11, where Petitioner's counsel expressly elected not to develop a further factual record in this case. Specifically, the co-defendant's counsel said after submitting the affidavits which are in the record presently, co-defendant's counsel said, It would be my position on behalf of the co-defendant that sufficient declarations have been presented to air out this issue. I'm prepared to go forward at this time without further disclosure of juror addresses, juror addresses being for the purpose of developing additional information. Petitioner's counsel said, I would be prepared to go forward at this time. Court clarified, you're withdrawing the motion for juror information. Co-defense counsel said, yes, and defense counsel said, that's fine, Your Honors. Petitioner elected to go forward based solely on these declarations. The court made its finding of facts based on these declarations, and Petitioner cannot now complain about not having a sufficient opportunity to develop an additional factual basis. As far as what the state court's factual findings were, the same reporter's transcript, pages 29 and 30, the court makes essentially two findings of fact. The first, that the jury engaged in full discussions, and the second being an explicit and also somewhat implied statement that juror Wu did not state that, based on his outside knowledge of the law, a heat of passion defense can never apply to drive-by shootings, but rather that that he had such an opinion based on the facts in this case. That's not misconduct. And sharing your opinion that the facts in a particular case do not support a particular defense, sharing that opinion is not misconduct either. Because the state court made these factual findings, Petitioner, they are presumed to be correct, and habeas relief does not lie unless there are an unreasonable determination of the facts, which in this case they were not. There are two declarations in the record from O'Sullivan, one of which makes the statement, the first of which makes the statement that heat of passion was not meaningfully discussed. Trial court said that that statement was simply incredible. The suggestion that the jury never discussed the heat of passion, despite the fact that it asked the court about heat of passion and was instructed twice on it, sort of disproves any sort of credibility that O'Sullivan might have had. In addition to the fact that his statement is rebutted by every other declaration that Petitioner and the prosecutor introduced in this case. So Petitioner hasn't been able to overcome the presumption that these factual findings were correct, merely by reference to the same exact declarations that the state court has already considered. And even assuming, under the worst possible scenario, that juror O'Sullivan's declaration of what Wu said was correct, there would still be no misconduct, because there is no suggestion that Wu's statement of the law was based on his outside knowledge of the law. He was a civil lawyer working for Hewlett Packard. There was no suggestion that he had any sort of particularized experience with the criminal law, such that he would state, based on my outside knowledge of the law, I can tell you that the two defense attorneys are wrong, the prosecutor is wrong, and the court is wrong. Thank you, counsel. Thank you. I would just like to make the point that in all of these situations where the prosecutor is trying to keep the evidence away from the jury, it's because he feels it's prejudicial to his case. If it's prejudicial to his case, it's because... That's the balance here. This is an evidentiary rule which balances. The rule that the trial court was using was a balance of prejudice against probative value. And I frankly think the question, therefore, isn't whether it might have turned a jury, but whether it might have legitimately turned a jury, right? Whether it might have turned a jury based on its probative value and not based on its prejudicial value. Right. Right. But that it was objectively unreasonable for the judge to rule this way based on the situation of the case. And I need to respond to the misconduct in terms of the citation to what Respondent sees as a concession of the motion for new trial issue, which was an agreement that they were willing to go forward at this time with the motion rather than to go forward with a motion for disclosure of the addresses of the jurors, when they had declarations from a good part of the jurors in this case. And so this wasn't conceding that there was no basis for a motion for new trial. No. But was it agreeing to go ahead on the declarations rather than on live testimony?  It wasn't a point where they didn't want to submit testimony, but that they were not going forward with a motion to get disclosure of juror addresses to develop it further because they felt they had their prima facie case for a motion for new trial, that they could show misconduct based on Mr. O'Sullivan's testimony.  And the court denied the motion. Okay. Thank you very much. Thank you. Case test argued will be submitted. The court will stand in recess for today. All rise. Go ahead. I'll be just a minute. Please sit down. Thank you.
judges: Reinhardt, Thompson, Berzon